Steven J. Skikos, Bar No. 148110
Adriana Suarez-Desmond, Bar No. 216564
**SKIKOS, CRAWFORD, SKIKOS**
**JOSEPH & MILLICAN**
625 Market Street, 11th Floor
San Francisco, CA 94105
415-546-7300
415-546-7301 Fax
sskikos@skikoscrawford.com
asuarez@skikoscrawford.com

Russell S. Briggs
Joseph C. Melugin
**FIBICH HAMPTON & LEBRON, LLP**
1401 McKinny, Suite 1800
Houston, TX 77010
Phone: 713-751-0025
Fax: 713-751-0030

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PATRICIA MUNS,** | Case No.:   **'11 CV 0334 H    RBB** |
| **Plaintiff,** | |
| **vs.** | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **ZIMMER HOLDINGS, INC. AND ZIMMER INC.,** | |
| **Defendants.** | |

Plaintiff PATRICIA MUNS ("Plaintiff"), alleges on personal knowledge and on information and belief as follows:

### INTRODUCTION

1.     This product liability action relates to the design, development, manufacture, testing, marketing, promotion, distribution, and sale of Zimmer's defective hip implant component known as the Durom Acetabular Component (the "Durom Cup").

2.     The Durom Cup was surgically implanted in Plaintiff on November 7, 2007, which required surgical revision on March 12, 2009, because the Durom Cup was defective. These multiple surgeries caused Plaintiff to suffer significant injuries, including great pain and agony that restricted her ability to engage in physical activities.

3.     Zimmer, founded in 1927, is one of the leading competitors in the U.S. hip and knee replacement market and accounted for seventy percent of the market in 2008.

4.     In 2008, the U.S. hip and knee replacement market was valued at $6.7 billion dollars, with the hip replacement market contributing thirty-eight percent of the market at roughly $2.5 billion dollars.  According to Zimmer's 2008 Annual 10-K Report, Zimmer was number one in global market share for reconstructive hip components.  In the period ending December 2008, Zimmer reported $1,279.5 million in hip component sales.  Zimmer's total 2008 sales exceeded $4 billion.

5.     Zimmer designs, develops, manufactures, markets, tests, distributes and sells reconstructive orthopedic implants, including joint, dental and spinal implants, trauma products and related orthopedic surgical products.  Zimmer's related orthopedic surgical products include surgical supplies and instruments designed to aid in orthopedic surgical procedures.  Zimmer also has a limited array of sports medicine products.  Zimmer's primary customers include musculosketal surgeons, neurosurgeons, oral surgeons, dentists, hospitals, distributors, healthcare dealers and, in their capacity as agents, healthcare purchasing organizations or buying groups.  These customers range from large multi-national enterprises to independent surgeons.

6.     Zimmer's Durom Cup is an orthopedic device used in total hip replacement surgeries. Hip replacement surgery, also known as hip arthroplasty, is a surgical procedure in which the patient's hip joint is resurfaced and replaced with an artificial implant.  It is typically used to repair joint/bone damage or to treat arthritis pain in the hip joint area.  The hip joint is in essence a large ball-and-socket joint composed of two parts: the head of the thighbone, or femur; and the acetabulum, a cup-shaped bone in the pelvis.  Therefore, hip replacement surgery traditionally consists of two tasks: (1) replacing the end of the femur, or thighbone, with an artificial "ball," typically made of metal or stainless steel; and (2) resurfacing the hip socket using a metal shell and plastic liner, into which the ball attached to the femur will fit.

7.    During hip replacement surgery, damaged portions of the hip are replaced with smooth, durable artificial surfaces to allow the joint to function properly.  The Durom Cup is not cemented or screwed in place during implantation.  Instead, it was designed to bond to the patient's hip bone.  The outside of the Durom Cup is porous, and has been sprayed with a highly engineered substance that is intended to facilitate the cup's acceptance by the human body.  It is purportedly intended that the patient's own bone will grow into the exterior shell of the cup.  This bone in-growth into the porous shell is what is intended to hold the cup in place.

8.    Rather than functioning in the intended manner, the Durom Cup implant resists bone growth and as a result, instead of adhering to the bone, it comes loose and/or pops free from the hip, which can cause damage to the pelvic bone.  This unintended result causes extreme and devastating pain and necessitates revision surgery to remove the failed Durom Cup and replace it with a product that functions properly.

9.    The Durom Cup is part of a metal-on-metal hip implant system, which was widely sold as being more durable, especially in young and active patients, like Plaintiff.

10.    The suspension of the sales of Zimmer's Durom Cup, announced on July 22, 2008, affects thousands of patients.  The Durom Cup has been implanted in over 12,000 patients in the United States since it was first sold on the U.S. market in 2006.

11.    When introducing the Durom Cup, Zimmer represented that the Durom Cup would provide greater range of motion and less wear on the bearing than traditional hip replacement implant components, thus making it an ideal product for younger, active patients.  Contrary to Zimmer's representations, the Durom Cup is prone to an unprecedented failure rate for hip replacement implant components.

12.    Since Defendants first began selling the Durom Cup in the United States in 2006 through on or about July 22, 2008, the product labeling and product information for the Durom Cup failed to contain adequate information, instructions, and warnings concerning implantation of the product and the risks that the Durom Cup can loosen and separate from the acetabulum (hip socket) in patients.

13.     Despite their knowledge of the serious injuries associated with use of the Durom Cup, Defendants engaged in a marketing and advertising program which, as a whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the Durom Cup was safe.

14.     At all relevant times, Zimmer knew or should have known that the Durom Cup was not safe for the patients in whom it was implanted, including Plaintiff, because of the unacceptable failure rate, which is approximately 24%, according to one leading hip surgeon.

15.     Notwithstanding the knowledge of predicted failures with the defective Durom Cup, Zimmer continued to sell the Durom Cup for implantation in patients until July 22, 2008, when Zimmer announced a suspension of the sale and distribution of the Durom Cup.

16.     Plaintiff and patients in whom the Durom Cups remain implanted, not only have suffered physical injuries, they also bear an unacceptable increase in the risk of severe pain and disability, with or without a costly and painful revision surgery.  The revision surgery is invasive and painful and is often needed to replace the defective Durom Cup implant, as it was here.

17.     Plaintiff asserts claims under the Product Liability Act for failure to warn, design defect and manufacturing defect as well as common law and statutory claims for breach of express warranty, punitive damages and loss of consortium.

18.     Plaintiff seeks actual damages and all other relief available to Plaintiff.

## II.  PARTIES

**A.     <u>Plaintiff</u>**

19.     At all times referenced herein, Plaintiff, PATRICIA MUNS, was and is a citizen of Oceanside, CA.

20.     Plaintiff, at the age of sixty-three years, had the Durom Cup implanted into her right hip on November 7, 2007 at Tri-City Medical Center in Oceanside, California.  She suffered numerous physical injuries including, but not limited to pain and immobility preceding the surgery and then an additional surgery on March 12, 2009 at Tri-City Medical Center in Oceanside, California to remove and replace the Durom Cup, and various physical manifestations of extreme physical and emotional pain and suffering.

**B.** **Defendants**

21. Defendant Zimmer Holdings, Inc. is a Delaware corporation with its principal place of business at 345 East Main Street, Warsaw, Indiana, 46580-2746. At all relevant times, Zimmer Holdings, Inc. was the publicly traded holding company with wholly owned subsidiaries, that it controlled, which designed, manufactured, marketed, supplied and sold to distributors, physicians, hospitals, patients and medical practitioners certain hip socket devices known as the Durom Cup to be surgically implanted in patients throughout the United States, including in the State of California.

22. Defendant Zimmer, Inc. is a Delaware corporation with its principal place of business at 1800 West Center Street, Warsaw, Indiana, 46581-0708. At all times relevant, Zimmer, Inc was a wholly owned subsidiary of Defendant Zimmer Holdings, Inc. At all times relevant, Defendant, Zimmer, Inc. was duly organized and existing under the laws of the State of Delaware with its principal place of business for manufacturing the Durom Cup in Warsaw, Indiana. Defendant, Zimmer, Inc. designed, manufactured, marketed, supplied and sold the Durom Cup to physicians, hospitals, and clinics to be surgically implanted in patients in the State of California.

23. At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other Defendant. During the relevant times, Defendants possessed a unity of interest between themselves and Zimmer exercised control over its subsidiaries and affiliates. As such, each Defendants are each individually, as well as jointly and severally, liable to Plaintiff for Plaintiff's injuries, losses and damages.

## JURISDICTION AND VENUE

24. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $150,000.00 exclusive of interest and costs.

25. Venue in this action properly lies in the Southern District of California pursuant to 28 U.S.C. §§ 1391 (a) and (c), as plaintiff resides here, a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this District. At all times material hereto, Defendants conducted substantial business in the State of California and in San Diego County.

26. Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in San Diego County, California, through its employees, agents and/or sales representatives, and derived substantial revenue from such business.

27. At all relevant times, Defendants placed the defective device into the stream of interstate commerce that was implanted in Plaintiff.

28. Defendants are conclusively presumed to have been doing business in this state and are subject to California's long arm jurisdiction.

29. At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of California, including San Diego County.

30. Plaintiff's damages in this matter accrued in the Southern District of California.

**FACTUAL ALLEGATIONS**

I. **BACKGROUND ON ARTIFICIAL HIPS AND REPLACEMENT DEVICES**

31. The human hip joint consists of two parts: a ball and a socket. A portion of the pelvic bone forms a cup-shaped socket; the ball at the top of the thigh bone fits into it. The ball is surrounded with cartilage which, in a healthy hip joint, allows the ball to move smoothly within the socket. Conditions such as osteoarthritis and avascular necrosis can cause degeneration of the hip joint such that hip replacement is required. A hip implant is designed to replicate the human anatomy — that is, the relatively simple ball and socket structure of the human hip joint. Total hip replacement surgery involves implanting an artificial ball and socket into the patient.

32. The artificial hip implantation process requires a surgeon to insert a metal cup with a smooth lining into the patient's diseased pelvic socket. The lining serves the same purpose as natural cartilage: allowing for smooth movement of the ball portion of the thigh bone. The diseased or degenerated ball part of the thigh bone is then removed and replaced by a metal or sometimes ceramic ball mounted onto a thin metal stem. The metal stem is then fit into the thigh bone. Finally, the ball is placed securely into the pelvic socket that has been fitted with the artificial metal cup, where it should move easily, without friction or pain to the patient.

33.    Total hip replacement is most commonly used to treat joint failure caused by osteoarthritis. Other indications include rheumatoid arthritis, avascular necrosis, traumatic arthritis, protrusion acetabuli, certain hip fractures, benign and malignant bone tumors, arthritis associated with Paget's disease of the bone, ankylosing spondylitis and juvenile rheumatoid arthritis. The aims of the procedure are pain relief and improvement in hip function. Hip replacement is usually considered only once other therapies, such as pain medications, have failed.

34.    Total hip arthroplasty ("THA"), or total hip replacement, is a common medical procedure performed on more than 420,000 patients in the U.S. each year. It is designed to help relieve pain and improve joint function in people with severe hip degeneration due to arthritis or trauma. Traditional devices to replace degenerative hips utilize implantable metal or ceramic heads fitting into a modular metal-backed polyethylene bearing. One concern that historically plagues successful THAs is the wear of the bearing. As the THA becomes more common among younger patients who want to maintain a physically active lifestyle, alternative bearing surfaces such as cross-linked polyethylene, ceramic-on-ceramic and metal-on-metal have been developed to address the issue of wear. The Durom Cup promised to offer an alternative surface that would resist wear and tear.

35.    The Durom Cup is a monoblock (constructed of a single piece of material) cup made of cobalt chromium (CoCr) alloy and is designed for use in combination with Zimmer's Metasul Metal-on-Metal Tribological Solution LDH (Large Diameter Heads) for THA. The design and material of the Durom Cup are key elements to its intended stability, wear resistance, and bone sparing characteristics. The Durom Cup has a pure titanium plasma-sprayed coating for fixation. The coating on the Durom Cup sold in the United States has a different structure and is slightly thicker (0.1mm) compared to the same products which were sold for use in patients outside of the United States.

II.    **HISTORY OF THE DUROM CUP**

36.    The Durom Cup was launched in Europe in 2003 for hip resurfacing. Hip resurfacing requires less bone removal than conventional THA, but necessitates a different surgical technique. The Durom Cup was made available in Canada and Australia in 2003, India and Korea in 2005, and Argentina in 2006.

37.    On or about December 19, 2005, Zimmer submitted a section 510(k) Premarket Notification of Intent (K053536) to the FDA to manufacture and market the Durom Acetabular Component and the Metasul LDH (Large Diameter Heads) devices to the public.  Three months later, on March 19, 2006, the FDA cleared the device for marketing and distribution in the United States.

38.    The 510(k) approval process by the FDA is regarded as a simplified "me too" application process, which does not require extensive review and approval by the FDA.  A 510(k) is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device that is not subject to premarket approval.  Submitters simply must compare their device to one or more legally marketed devices (devices marketed prior to May 28, 1976) and make and support their substantial equivalency claims.  The FDA does not perform 510(k) pre-clearance facility inspections and submitters may market the device immediately after 510(k) clearance is granted.

39.    In this instance, Zimmer submitted a simplified 510(k) application that compared the Durom Cup to earlier products called "predicate devices" manufactured by competitors.  In its application, Zimmer described:  "The proposed device has the same intended use, has similar performance characteristics, is manufactured from similar materials using similar processes, and is similar in design to the predicate devices."

40.    No clinical studies were conducted in connection with the submission of the application for the Durom Cup.  As part of the application process, Defendants stated that the "results of non-clinical analysis demonstrate that the device is safe and effective and substantially equivalent to the predicate device (as implants)."  Further in their submission to the FDA the Defendants repeat throughout that the Durom Cup is intended to be a device that is simply similar to previously approved predicate devices.  Therefore, the FDA was persuaded by Defendants that any additional review and investigation was unnecessary.

### III.    DESIGN & MANUFACTURE OF THE DUROM CUP

41.    Zimmer's Durom Cup is a flattened hemisphere, which is meant to offer a greater range and freedom of movement.  With a constant wall thickness of 4 mm throughout all sizes, the cup maintains an inner diameter as large as possible, while intended to maintain maximum implant strength

and minimum bone resection of acetabular bone mass. A coating of pure titanium using a plasma spray under vacuum and static load is applied to the outer surface, called Porolock (tm) Ti VPS. The high carbon cobalt chromium (CoCr) alloy is produced by a forging rather than casting process. This means that the size of block carbides is up to eight-times smaller compared to cast cobalt chromium (CoCr) prostheses. The resulting lower surface roughness was intended to lead to a lower wear rate when compared with cast cobalt chromium (CoCr) alloys.

42. Zimmer failed to recognize the deficiencies of the Durom Cup due to poor and inadequate quality assurance procedures, including failure of Zimmer to implement appropriate physical, manual, x-ray, microscopic and other inspections of the Durom Cup. Zimmer failed to implement or utilize adequate safeguards, tests, inspections, monitoring and quality assessments to ensure safety of the defective device. At the time the devices were manufactured and sold to patients, the devices were defectively manufactured and unreasonably dangerous, and did not conform to the federal regulations subjecting patients to risks of injury.

43. During the time Zimmer manufactured the Durom Cup, inadequate manufacturing processes led to material flaws in the quality systems at its manufacturing facilities.

44. During the course of manufacturing the Durom Cup, Zimmer failed in several ways, including, without limitation, by:

    (a)    failing to conduct adequate mechanical testing on components, subassemblies and/or finished Durom Cup;

    (b)    failing to test an adequate number of sample devices on an ongoing basis;

    (c)    failing to take adequate steps to specifically identify failure modes with clarity and suggest methods to monitor, avoid, and/or prevent further failures;

    (d)    failing to identify and/or note the significance of any testing that resulted in failure of the Durom Cup;

    (e)    failing to take corrective actions to eliminate or minimize further failures of the Durom Cup;

    (f)    failing to adequately explain performance specifications for the components, subassemblies, and finished Durom Cup;

(g)    failing to adequately explain or justify all test conditions and acceptance criteria for the Durom Cup;

(h)    failing to perform adequate testing in an environment that adequately simulated in vivo conditions; and, by

(i)    failing to perform adequate quality assurance testing before and after sterilization.

45.    Zimmer failed to perform adequate testing of the Durom Cup, including its components and subassemblies, to ensure that the Durom Cup functioned properly during and after implantation.

46.    As a result of these manufacturing and quality control problems associated with the manufacture of the Durom Cup, the component was inadequately and defectively manufactured making it adulterated, and outside of the specifications expressly approved by the FDA.

**IV.    DUROM CUP DEFECTS ARE EXPOSED BY LEADING PHYSICIANS**

47.    After the FDA initially approved the 510(k) application, Zimmer began to aggressively market the Durom Cup to physicians.

48.    Relying upon Zimmer's representations, physicians began using broadly the Durom Cup instead of other models. Reports of Durom Cup failures soon followed. It is now apparent that a significant percentage of the Durom Cups have failed, and that the failure rate is unacceptably high.

49.    The failure rate is estimated at upwards of 24% (twenty-four percent) when analyzing patients over a four-year period (2006-2010). This failure rate is much higher than similar products made by Zimmer, and is also much higher than the failure rate of competitor's devices. Furthermore, this rate is four times Zimmer's predicted failure rate of 5.7%

50.    Lawrence Dorr, M.D., a world-renowned orthopedic surgeon and Zimmer consultant, and a team of doctors at The Arthritis Institute at Good Samaritan Hospital in Los Angeles, California, have recently published the results of their study comparing one hundred and eighty patients who had the large-diameter (44- to 50-mm) Durom Cup and fifty-four patients who had a small-diameter (28-mm Metasul®) articulation implanted between May 2006 and November 2007. The total number of clinical failures was forty-one of one hundred and eighty patients (23%). Twenty-eight of one hundred

and fifty-one patients had radiographic impending failure at final follow-up (18.5%). All post-revision surgery retrieved cups were examined in detail and had no evidence of bone on the fixation surface.

51. Since at least 2007, surgeons implanting the Durom Cup complained to Zimmer that the device was failing in their patients, many of whom had to undergo painful, invasive and expensive revision surgeries.

52. One of these surgeons was Dr. Dorr, who warned Zimmer in 2007 of the high rate of Durom Cup failures. At the time Dr. Dorr warned Zimmer of the high rate of failures, he was a veteran of thousands of hip replacement surgeries.

53. In particular, Dr. Dorr informed Zimmer that x-rays showed that the Durom Cup was failing because it was separating or loosening from the bone, rather than fusing to it, causing patients crippling pain while the metal cup moved around the hip socket and rubbed against the bone.

54. Zimmer ignored Dr. Dorr's warnings and continued to sell the Durom Cup.

55. In April 2008, Dr. Dorr publicly warned other orthopedists about the cup failures his patients were experiencing and urged Zimmer to stop selling the Durom Cup.

56. On April 22, 2008, Dr. Dorr wrote the following memorandum to his colleagues at the American Association of Hip and Knee Surgeons:

> *MEMO*
> *DATE: 4/22/08*
> *TO: American Association of Hip and Knee Surgeons*
> *FROM: Larry Dorr, M.D.*
> *RE: This NOTICE is to inform you that we have had ten revisions in 165 hips and have four more that need to be revised using the Durom cup (Zimmer, Inc).*
>
> *This **failure rate** has occurred within the first two years. In the first year the x-rays looked perfect. We have revised four that did not have any radiolucent lines or migration (and John Moreland revised one). These early cups fooled us, but the **symptoms were so classic for a loose implant** that we operated the patients. When we hit on the edge of the cup **it would just pop free.** As time goes by the cups begin developing radiolucent lines. We now have one cup at two years that has actually migrated a short distance. It has tilted into varus. **We do not believe the fixation surface is good on these cups.** Also there is a circular cutting surface on the periphery of the cup that we believe **prevents the cup from fully seating. We stopped using the cup after the first revisions.**
>
> *We have notified Zimmer. **The FDA has been notified** and we will notify them of our continued revisions. The company does not believe it should pull the cup from the market so I am notifying all of my colleagues of our failure rate with this cup. I went through a similar scenario with the Sulzer cup failures where I was the only one experiencing revisions at the beginning and basically it was assumed that it was our technique. **I can assure you that this goes beyond technique.** I learned my lesson in not informing*

*everyone about **this magnitude of failures** with the Sulzer cup problem, so it is my obligation to do so with this cup.*

(emphasis in original).

57.    After informing colleagues about his experience with the Durom Cup, Dr. Dorr heard from several other doctors who reported similar problems.  According to Dr. Dorr and other physicians, x-rays of patients who received defective Durom Cups showed that the socket was separating from bone, rather than fusing with it.

58.    For patients (including Plaintiff), the slippage of the implant itself, as a result of its failure to adhere to the bone meant agony as the metal cup moved around in the hip socket and rubbed against bone.  As a result, Plaintiff could not walk without assistance.  Such crippling injuries are devastating to patients as they were to Plaintiff.

59.    Despite this memorandum, Zimmer again ignored the warnings and continued to sell the Durom Cup.

60.    In late May 2008, Zimmer finally informed surgeons that it was investigating Dr. Dorr's complaint but that it did not suspend sales, as Dr. Dorr had recommended.  While Zimmer investigated complaints, roughly 1300 more patients were implanted with the Durom Cup in the United States.

61.    Zimmer responded by defending the Durom Cup and blaming the doctors' implantation techniques.  Zimmer later attributed failures of the Durom Cup to a discrepancy in doctors' techniques in performing THA surgeries.  Zimmer contended (and still contends) that the technology and design parameters of the Durom Cup demand a surgical technique with "high precision and specificity compared to more common and familiar hip arthroplasty surgical techniques practiced in the U.S." Therefore, according to Zimmer, the Durom Cup requires additional training in implantation technique and cup placement for many surgeons who use the device and who may otherwise may be experts in THA.

62.    Zimmer's investigation included clinical investigation and interviews with surgeons at eight high volume clinical sites in the United States and four in Europe.  According to an article published in the New York Times, on Friday June 18, 2010, entitled, "Surgeon vs. Knee Maker: Who's Rejecting Whom?", "two doctors who provided Zimmer with supportive data in 2008 said the hip

started failing soon afterward in their patients, too. One, Dr. Richard Illgen of the University of Wisconsin, said he now realized that Dr. Dorr's technique was not the issue, but that Dr. Dorr had just started using the Zimmer hip before other surgeons."

63.    Around this time, although Zimmer still maintained that there were no issues with Durom Cup, other doctors began to stop implanting them.  Even still, Zimmer continued to market the Durom Cup to unsuspecting physicians and patients, selling hundreds of units between May 2008 and July 22, 2008.

64.    Throughout 2008, while the Durom Cup was being implanted in patients across the United States and around the world, Zimmer was accumulating mounting and overwhelming reports that the Durom Cups were failing at an alarming and undisclosed rate.

## V.    TEMPORARY SUSPENSION OF THE DUROM CUP

65.    Zimmer continued to sell the Durom Cups for implantation in patients until July 22, 2008, when Zimmer announced it was temporarily suspending the Durom Cups from marketing and distribution in the United States.  In its announcement, Zimmer stated that the suspension was necessary "while the Company updated labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S."

66.    Zimmer announced that the company was taking this "voluntary action to address its concerns regarding reports of cup loosening and revisions of the acetabular component used in total hip replacement procedures" but that Zimmer "has found no evidence of a defect in the materials, manufacture, or design of the implant."

67.    On August 16, 2008, Zimmer announced "additional product labeling, more detailed surgical technique instructions and specific information regarding a comprehensive surgical training program."  Following the completion of Zimmer's online training program, the Durom Cup was again available for usage.

## VI.    ZIMMER'S IMPROPER FAILURE TO RECALL DUROM CUP

68.    Under federal regulations, a recall is "a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure."  A recall is an effective method

1  of removing or correcting consumer products that are in violation of laws administered by the FDA.

2      69.    These sections also recognize that recall is an alternative to an FDA-initiated court

3  action for removing or correcting violative, distributed products by setting forth specific recall

4  procedures for the Food and Drug Administration to monitor recalls and assess the adequacy of a firm's

5  efforts in recall. A company's voluntary recall of a medical device and the FDA's classification of that

6  action as a Class I recall establish that the device violates FDA regulations.

7      70.    To date, Zimmer has not issued a public recall of the Durom Cup and instead has

8  described its action as only a "temporary suspension" of the device. In reality, Zimmer has made the

9  device "unavailable for purchase in the United States," but has not voluntarily recalled the device.

10  **VII.    PLAINTIFF'S INJURIES DUE TO THE DEFECTIVE DUROM CUP**

11      71.    Plaintiff, a sixty-three year-old from Oceanside, California has been significantly injured

12  due to the implantation of the Durom Cup in Plaintiff's right hip. After the implantation of the Durom

13  Cup, Plaintiff began experiencing significant pain and discomfort with increasing intensity. On or about

14  March 2009, she described the pain as sharp, stabbing and severely disabling pain or like a "hammer

15  hitting my hip." X-rays revealed loosening of the Durom cup.

16      72.    The excruciating pain Plaintiff suffered required the use of crutches, a cane and/or a walker until

17  she underwent a revision surgery on March 12, 2009. The acetabular cup was found to be loose and easily

18  removed. This is exactly the failure mode described by Dr. Dorr that occurred in Dr. Dorr's patients.

19      73.    Plaintiff was hospitalized from March 12, 2009 through March 15, 2009 for her revision surgery

20  due to the failure of her Durom Cup. She also underwent physical therapy for an extended period of time.

21      74.    Plaintiff has suffered extreme physical pain following her original hip replacement surgery. She

22  experienced extreme pain that hindered her ability to perform basic physical motions.

23      75.    In reliance on Zimmer's marketing of the Durom Cup, Plaintiff and her physician expected that

24  this device would provide her with better stability and range of motion than other hip replacement devices on the

25  market. In addition, Plaintiff's physician believed that the Durom Cup should last her for the rest of her life.

26  Instead, she had to encounter the aggravation, fear, expenses and loss of time in undergoing additional pre-

27  surgery physicals, testing, unnecessary exposure to radiation and diagnostic tests, medications, risks of surgery

28  and anesthesia and the surgery.

## CLAIMS FOR RELIEF

## COUNT I

## Failure To Warn And Instruct

76.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

77.     At all relevant times hereto, Defendants were engaged in the development, testing, manufacturing, marketing and sales of the Durom Cup.  Defendants designed, manufactured, assembled and sold the Durom Cup to medical professionals and patients knowing that they would then be implanted in patients in need of hip prosthesis.

78.     Defendants distributed and sold the Durom Cup in the condition in which it left its place of manufacture, in its original form of manufacture, which included the defects described herein.  The Durom Cup was expected to and did reach Plaintiff without substantial change or adjustment in its condition as manufactured and sold by Defendants.

79.     The Durom Cup designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendants was in a dangerous and defective condition and posed a threat to any user or consumer of the Durom Cup.  Plaintiff was and is in a class of persons that Defendants should have considered to be subject to the harm caused by the defective nature of the Durom Cup.

80.     The Durom Cup was implanted and used in the manner for which it was intended.  This use has resulted in severe physical and emotional and other injuries to Plaintiff.

81.     Defendants knew or should have known through testing, adverse event reporting, or otherwise, that the Durom Cup created a high risk of bodily injury and serious harm.

82.     Defendants failed to provide adequate and timely warnings or instructions regarding the Durom Cup and its known defects.  Defendants failed to advise patients like Plaintiff that monitoring of the cup was necessary to avoid long and painful period, where the device failure would go undetected – as it did here.

83.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental

anguish, economic losses and other damages. As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial.

## COUNT II

## Design Defect

84. Plaintiffs hereby incorporate by reference all other paragraphs of the Complaint as if fully set forth herein.

85. Zimmer is the manufacturer and/or supplier of the Durom Cup and placed this device into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Durom Cup.

86. The Durom Cup manufactured, marketed, distributed and/or supplied by Zimmer was defective in design or formulation in that, when the medical device left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

87. The Durom Cup was expected to and did reach Plaintiff without substantial change in condition. Alternatively, the Durom Cup manufactured and/or supplied by Defendants was defective in design or formulation, because when the Durom Cup device left the hands of Defendants, the manufacturers and/or suppliers, the Durom Cup was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

88. The Durom Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq., and the Medical Devices Amendment thereto (hereafter "FDCA"). The facilities or controls used by Defendants in the manufacture, packing, storage, or installation of the Durom Cup were not in conformity with applicable requirements of the FDCA.

89. The Durom Cup manufactured and/or supplied by Zimmer was defective due to inadequate warnings and/or inadequate trials, testing and study, inadequate exposure of the real risks inherent with the drug as determined by the clinical trials, and inadequate reporting of the results of the clinical trials and post-marketing clinical experiences with the device.

90.     The Durom Cup manufactured and/or supplied by Zimmer was defective due to inadequate post-marketing warnings or instructions because, after Zimmer knew or had reason to know of the risk of injury from the Durom Cup, it failed to provide adequate warnings to the medical community, patients, and the public, including Plaintiff, and continued to promote and advertise the Durom Cup as safe and effective.

91.     The Durom Cup was designed, manufactured, distributed, tested, sold, marketed, and advertised defectively by Zimmer.  As a direct and proximate cause of Zimmer's defective design of the Durom Cup, Plaintiff and other patients had the device implanted in their bodies, and suffered and will continue to suffer increased risk of long-term complications and pain and additional surgeries, personal injuries, the need for corrective surgery, and pain and suffering.

92.     Zimmer was or should have been in possession of evidence demonstrating that the Durom Cup caused serious injuries and would fail.  Nevertheless, Zimmer continued to market the device by providing false and misleading information with regard to the safety and efficacy of the Durom Cup and improperly claiming that the device was safe once the training program was instituted.

93.     Zimmer's actions, as described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff, other patients and the public.

94.     As a result of Zimmer's conduct, Plaintiff suffered losses, injuries and damages specified herein.

## COUNT III

### Manufacturing Defect and Failure to Adhere to Quality Controls

95.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

96.     The Durom Cup is defectively manufactured because the foreseeable risks of mechanical malfunction and failure outweigh the benefits associated with the Durom Cup.

97.     The Durom Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq., and the Medical Devices Amendment thereto (hereafter "FDCA").  The facilities or controls used by Defendants in the manufacture, packing,

storage, or installation of the Durom Cup were not in conformity with applicable requirements of the FDCA.

98.     The Durom Cup was expected to and did reach the Plaintiff without substantial change or adjustment to its mechanical function.

99.     Defendants knew or should have known of the manufacturing defects and the risk of serious bodily injury that exceeded the benefits associated with the Durom Cup.

100.     Furthermore, the Durom Cup and its defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

101.     The Durom Cup was defective due to inadequate warnings or instruction because Defendants knew or should have known that the Durom Cup created a high risk of bodily injury and serious harm.  Defendants failed to adequately and timely warn consumers of this risk.

102.     The Durom Cup is inherently dangerous for its intended use due to a manufacturing defect or defects and improper functioning.  Defendants are therefore strictly liable to Plaintiff for their breach of duty to Plaintiff.

103.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, and Plaintiff has suffered and will continue to suffer severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory damages in an amount to be proven at trial.

## COUNT IV

### Breach of Express Warranty

104.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

105.     Defendants expressly warranted to Plaintiff by and through Defendants and/or their authorized agents or sales representatives, in publications, package inserts, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that the Durom Cup was safe, effective, fit and proper for its intended use.

106.     In allowing the implantation of the Durom Cup, Plaintiff and her physician relied on the skill, judgment, representations, and express warranties of Defendants.    These warranties and

representations were false in that the Durom Cup was not safe and was unfit for the uses for which it was intended.

107.    Through sale of the Durom Cup, Defendants are merchants pursuant to Section 2-314 of the Uniform Commercial Code.

108.    Defendants breached their warranty of the mechanical soundness of the Durom Cup by continuing sales and marketing campaigns highlighting the safety and efficacy of their product, while they knew of the defects and risk of product failure and resulting patient injuries.

109.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT V

### Punitive Damages Act

110.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

111.    The acts of Zimmer were willful and wanton, malicious, and showed a total disregard for human life and human suffering.  Based upon the acts alleged herein, Zimmer knew or should have known,  that the very patients whose lives were supposed to be improved by the hip implants,  would instead be subject to enhanced  pain and suffering and duplicative surgeries,  that their conduct would naturally and probably result in injury and damage.  Zimmer continued such conduct with malice and/or in reckless disregard of the consequences, from which malice may be inferred.  Plaintiff should be awarded punitive damages against Zimmer, based upon the acts herein so as to punish Zimmer and deter similar conduct by Zimmer.

112.    The acts and/or omissions of Defendants as set forth supra, were also such knowing and willful failures to warn of the failures of the product and lack of efficacy and risks, that they constituted malicious, willful, wanton, and/or reckless conduct.

113. The Defendants were or should have been in possession of evidence demonstrating that its product failed at a high rate. Nevertheless, they continued to market the product by providing false and misleading information with regard to safety and efficacy.

At all times relevant herein, Defendants:

      (a)    knew that the product was dangerous;

      (b)    concealed the dangers and health risks from the Plaintiff, his surgeon and the public at large;

      (c)    made misrepresentations to the Plaintiff, his surgeon and the public in general as previously delineated herein as to the safety and efficacy of the product

      (d)    failed to inform and misled the FDA as to the failure rate and dangers of the product

WHEREFORE, Plaintiffs pray for judgement against Defendants as follows:

1. Economic and non-economic damages in an amount in excess of $150,000 as provided by law and to be supported by the evidence at trial;

2. For compensatory damages according to proof;

3. For punitive damages;

4. For an award of attorneys' fees and costs;

5. For prejudgment interest and the costs of suit; and

6. For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable in this civil action, as provided by Rule 34(b) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

Dated: February 17, 2011

SKIKOS, CRAWFORD, SKIKOS
JOSEPH & MILLICAN

By: ___/s/ Adriana Suarez_____

ADRIANA SUAREZ
Attorneys for Plaintiff

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Patricia Muns | Zimmer Holdings, Inc. and Zimmer Inc. |

**(b)** County of Residence of First Listed Plaintiff <u>San Diego</u>
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant <u>Kosciusko</u>
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Adriana Suarez
Skikos, Crawford, Skikos, Joseph & Millican
625 Market Street, 11th Floor
San Francisco, CA 94105
415-546-7300

Attorneys (If Known)

'11 CV 0334 H    RBB

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 370 Other Fraud | | | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | or Defendant) | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332

Brief description of cause:
Personal injury as a result of being implanted with Defendants' product

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
February 17, 2011

SIGNATURE OF ATTORNEY OF RECORD
/s/ Adriana Suarez

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

American LegalNet, Inc.
www.FormsWorkflow.com